UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

NANCY S. MOLES, )
    *Plaintiff*, )
)
    *vs.* ) 1:10-cv-00952-JMS-TAB
)
MICHAEL J. ASTRUE, )
COMMISSIONER OF SOCIAL SECURITY )
ADMINISTRATION, )
    *Defendant.*

### **ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Nancy Moles filed an Application for Disabled Widows Benefits ("DWB") on July 11, 2002, alleging a disability onset date of January 16, 2001.[1] [Tr. 129.] After three hearings, the Administrative Law Judge ("ALJ") made an unfavorable decision, which was ultimately remanded by the Appeals Council. [Tr. 29,143-45.] To obtain benefits under DWB, Ms. Moles had to show that she was disabled (using the same standards of "disability" required in social security income claims, *Forbes v. Barnhart*, 467 F.Supp.2d, 808, 817 (N.D.Ill. 2006),) sometime between May 3, 2002 and June 30, 2005 (the "prescribed period").[2] [Tr. 30.] *See* 20 C.F.R. § 404.335. After a hearing, the ALJ deemed Ms. Moles not disabled during the prescribed period. On May 20, 2010, the Appeals Council denied Ms. Moles' request for review, [tr. 6-8], rendering it the Agency's final decision. 20 C.F.TR. § 404.981. Ms. Moles now requests review of the Agency's decision under 42 U.S.C. § 405(g).

**I.**

---

[1] Ms. Moles also filed an application for Supplemental Security Income ("SSI"), which was denied, on August 29, 2001. [SR. 6, 2.]

[2] The regulations provide that the entitlement for DWB begins on the date that the claimant is at least 50 years old and shows that she has a disability that began within seven years of the wage-earner's death. *See* 20 C.F.R. § 404.335.

1

## BACKGROUND

Ms. Moles was 50 years old when the prescribed period began and 53 years old when it ended. [Tr. 44, 1665.] She has a GED, [tr. 1665], and has previous experience working low-wage jobs, primarily in the food industry, [tr. 32].

### A) Medical Evidence[3]

Ms. Moles has a long history of mental illness. Within the prescribed period, her first diagnoses were dysthymia, depression, bipolar disorder, posttraumatic stress disorder, and borderline personality disorder.[4] [Tr. 344, 507, 511, 528,456, 565.] In February 2003, Ms. Moles' psychiatrist changed her diagnosis of major depression to schizoaffective disorder depressed type. In May 2003, her schizoaffective disorder depressed type diagnosis was changed to schizoaffective disorder bipolar type. [Tr. 39 (internal citations omitted).]

The record, in sum, documents consistent difficulty living with and getting along with others, intermittent suicidal ideation, periods of poor sleep, depression, anxiety, and hearing voices. All of these symptoms were, to varying degrees, controlled with different combinations of medication. [Tr. 39-40 (internal citations omitted).] At certain times, Ms. Moles was treated with outpatient individual and group therapy and with medication management.

Throughout the prescribed period, Ms. Moles used several antipsychotic medications, which were changed by psychiatrists with relative frequency based on her symptomatology. She used Haldol with Cogentin to help with coordination and shaking, for which Risperdal was later

---

[3] Because Ms. Moles does not dispute the ALJ's consideration of her physical impairments, the Court will limit its recitation of the medical evidence in this case to that which concerns her mental impairments.

[4] Ms. Moles had previously been diagnosed with bipolar disorder mixed with psychotic features, auditory hallucinations, post-traumatic stress disorder, with symptoms such as difficulty being around others, psycho-social problems, auditory hallucinations, and mood swings including severe depression with occasional suicidal thoughts. [SR. 313-314.]

substituted due to sedation and dizziness. In February 2003, she switched to Abilify, which she used until May 2003, at which point she began taking Lithium, along with Seroquel for a brief time. At various points in 2003, Ms. Moles also used Prolixin, Cogentin, and Zyprexa Zydis. For her bipolar disorder, Ms. Moles used Depakote and Paxil until she switched to Zoloft in June 2003. She was prescribed Trazodone from September 2003 to January 2004, followed by Vistaril, for sleep difficulties. Ms. Moles was frequently medication non-compliant, leading to an increase in symptomatology. [Tr. 42 (internal citations omitted).]

Between April 2001 (before the prescribed period) and August 2004, Ms. Moles was assigned GAF[5] scores between 35 and 50, with along with a score of 65 (noted below) assigned by Carrie Dixon, Ph.D., a consultative examiner. Between February and April 2005, her GAF scores ranged from 50 to 65, the latter of which was again assigned by Dr. Dixon.

During the prescribed period, Ms. Moles was able to maintain personal hygiene and grooming, live alone occasionally, work part-time jobs occasionally, cook, clean, do laundry, read sporadically, do crossword puzzles, care for pets, shop, go to the library, drive, go to concerts, walk for transportation and exercise, visit with friends and relatives, and babysit at times. [Tr. 40 (internal citations omitted.]

---

[5] The Global Assessment of Functioning scale rates a "clinician's judgment of the individual's overall level of functioning" on a scale of 0 to 100. *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., Text Revision, 32, 34 (2000) (DSM IV-TR). A GAF rating of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas such as at work, family relations, judgment, thinking or mood. A rating of 41-50 represents serious symptoms (e.g. suicidal ideation) or any serious impairment in social, occupational functioning. A rating of 51-60 represents moderate symptoms. A rating of 70-61 indicates some mild symptoms or some difficulty in social or, occupational functioning, but generally functioning pretty well. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 34, DSM-IV-TR (4th ed. 2000).

There are several notable periods in the record, some of which occurred prior to the prescribed period.[6] In April 2001, Ms. Moles overdosed on sleeping pills, [tr. 338], and she was hospitalized a few months later for depression and suicidal thoughts, [tr. 224-29]. From July 2001 through May 2002, she was in residential treatment for alcoholism and mental illness. [Tr. 882.] For three days in September 200, [tr. 292], and again in March 2002, [tr. 1092], she was hospitalized for suicidal ideation.

In September 2002, Ms. Moles moved into her own apartment with her boyfriend, [tr. 702,709], and began a job making pizzas. [Tr. 709.] She complained of hearing voices that sometimes made it hard to stay on task. [Tr. 702, 709.] After 18 months, she was fired for missing work, [Tr. 819]—she reported the voices said she needed to stay home. [R.1679.]

In October 2002, consulting clinical psychologist Carrie Dixon, Ph.D., performed a mental status examination. [Tr. 290-94.] Dr. Dixon observed that Ms. Moles had some difficulty performing simple calculations, but was cooperative; appeared capable of managing her own funds; spoke fluently and coherently; had a normal affect and mood; and exhibited signs of good reality contact and fairly intact memory. [Tr. 293-94.] Ms. Moles, she noted, seemed deceitful about her symptoms and to attempt a "fake bad response style," but she appeared to do her best on tests; according to Dr. Dixon, her response style made the evaluation a "questionable representation of [Ms. Moles'] current cognitive-emotional functioning." [Tr. 292.] She diagnosed Ms. Moles with alcohol dependence, with reported eighteen-month recovery; depressive disorder; and anxiety disorder, and assigned her a GAF score of 65. [Tr. 293.]

On November 11, 2002, state agency reviewing psychologist J. Gange opined that Ms. Moles' depressive disorder caused mild limitations in her activities of daily living, social

---

[6] The Court considers episodes outside the prescribed period insofar as they provide background and context for the full picture of Ms. Moles' mental health during the prescribed period.

functioning, and concentration, persistence, or pace. [Tr. 276-86.] He based his opinion on the results of Dr. Dixon's exam and Ms. Moles' reported activities of daily living. [Tr. 288.] Four months later, Dr. K. Neville reviewed and affirmed Dr. Gange's opinion. [Tr. 276.]

In July 2003, Dr. Hua Luo, a psychiatrist at the Center for Mental Health, began seeing Ms. Moles as her treating doctor. [Tr. 480.] The following February, Dr. Luo prepared a psychological evaluation wherein he opined that Ms. Moles had marked difficulties in social functioning and maintaining concentration, persistence, or pace. [Tr. 876-86.] Additionally, he noted that Ms. Moles had marked or extreme difficulties in almost all areas of behavior within these two broader areas. [Tr. 878-79.] He concluded that she met and/or equaled the mental health listing for schizophrenic paranoia and other psychotic disorders. [Tr. 876-882.]

Dr. Luo further opined that Ms. Moles had "experienced numerous episodes of decompensation resulting in job loss, inability to keep a job, medication non-compliance resulting in increased symptoms, poor decision making, medication changes, increased need for therapy and/or case management services." [Tr. 881.] Dr. Luo also opined that Ms. Moles was markedly limited in 11 out of 20 enumerated mental activities; moderately limited in understanding and remembering detailed instructions, making simple work-related decisions, and interacting with the public; and not significantly limited in understanding, remembering, and carrying out very short, simple instructions. [Tr. 883-84.] As such, he concluded that Ms. Moles met the requirements of Paragraphs B and C of Listing 12.03 and the other mental health listings.

Dr. Luo submitted a mental residual functional capacity assessment likewise showing marked limitations with respect to sustained concentration and persistence, social interaction, and, somewhat to a lesser extent, adaptation. [Tr. 883-886.] There, he opined that Ms. Moles had moderate difficulty remembering things, such as having to be reminded to attend

5

appointments and to take or stop taking medications. [Tr. 885.] He noted that Ms. Moles displayed numerous examples of an inability to carry out detailed instructions, such as participating in group sessions and finishing therapy assignments. [Tr. 885.] He reported that Ms. Moles' anxiety about things she could not change interfered with her decision-making and schedule-keeping. [Tr. 885.] Dr. Luo indicated that Ms. Moles had sporadic hallucinations, which impeded her concentration. [Tr. 885.] He reported that Ms. Moles was superficially pleasant and likeable, but could not maintain appropriate social interaction; was easily angered; did not tolerate change well; and set unrealistic goals. [Tr. 886.]

In February 2005, consulting psychologist Carrie Dixon performed a second evaluation in which she administered a mental status examination, personality test, and memory test. [Tr. 405-09.] Dr. Dixon observed that Ms. Moles had no difficulty performing simple calculations; was cooperative; appeared capable of managing her own funds; spoke fluently and coherently; had a normal affect, pleasant mood, and appropriate appearance; and exhibited signs of good reality contact, no true signs of psychosis, and intact memory skills with no memory deficits overall. [Tr. 293-94.] The clinical and validity scales also showed "an individual who may have exaggerated symptoms, perhaps in an effort to receive immediate attention." [Tr. 408.] Dr. Dixon noted that Ms. Moles was mostly straightforward in her response style and appeared to do her best on tests. [Tr. 407.] She assigned Ms. Moles a GAF score of 65. [Tr. 408-09.][7]

**B) Medical Testimony**

At the hearing, therapist Becky Powell of the Center for Mental Health testified about her observations of Ms. Moles in individual and group therapy and during the time Ms. Moles was

---

[7] In July 2005, after the prescribed period, Dr. Luo and therapist Becky Powell submitted a Report of Psychiatric Status, showing the diagnosis of schizoaffective disorder (primary), borderline post-traumatic stress disorder, borderline personality disorder and alcohol dependency in full-remission. [Tr. 1092-1099.]

6

living at the group home. She indicated, among other things, that Ms. Moles had an inability to concentrate and complete tasks, was restless and agitated, and had an unstable mood. [Tr. 1690.]

A consultative clinical psychologist, Georgian Pitcher, testified that Dr. Dixon was the only medical source to perform a mental status exam to determine residual functioning. [Tr. 1714-19.] She stated that the results of a memory test were normal and that the results of a personality test and Ms. Moles' file showed that her main limitations were lack of self-esteem, irritability, and insecurity being alone. [Tr. 1752-59.] Dr. Pitcher opined that Ms. Moles did not appear to be significantly impaired in doing cognitive tasks. [Tr. 1763.] She opined that Ms. Moles could do simple, repetitive tasks in a more or less socially isolated situation, and that her impairments did not meet or medically equal a listing. [Tr. 1755-58.] She did not give Dr. Luo's opinion much weight because it was considerably before his more recent treatment and evaluation, and because he was making judgments based on a checklist related to employment. [Tr. 1757-58, 1763-64.]

**C) Vocational Expert Testimony**

At the hearing following remand, the ALJ asked the vocational expert what work was available for someone with Ms. Moles' vocational background who could perform light work that did not require consistent or frequent contact with the public; the vocational expert testified that such a person could perform the representative unskilled, light jobs of hand packers and packagers, production assemblers, and electronic assemblers. [Tr. 1769-73.]

## II.
### STANDARD OF REVIEW

This Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's (and ultimately the Commissioner's) findings. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. Otherwise the Court will remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

When evaluating a disability claim, an ALJ must use the following five-step inquiry:

(1) [is] the claimant…currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment…one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment,…can she perform her past relevant work, and (5) is the claimant…capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). To properly perform the analysis at Steps Four and Five, the ALJ must first find the disability claimant's RFC, or "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 416.945(a).

### III.
### THE ALJ'S OPINION

At Step One of his analysis, the ALJ found that Ms. Moles had not engaged in substantial gainful activity since the onset date of her alleged disability. [Tr. 32.] At Step Two, the ALJ found that Ms. Moles' bipolar type schizoaffective disorder, posttraumatic stress disorder, and borderline personality disorder were severe impairments, [tr. 32], but that none of her impairments met or equaled the criteria for listings 12.03, 12.04, 12.06, or 12.08. [Tr. 33.] In so

8

finding, the ALJ determined that Ms. Moles' symptoms did not meet the criteria for Paragraphs B or C of the mental health listings because she had no more than moderate restrictions of activities of daily living, social functioning, and concentration persistence and pace, [tr. 33-34], and because the evidence showed no episodes of decompensation of extended duration. [Tr. 34.]

In making his RFC assessment, the ALJ found that during the prescribed period, Ms. Moles had no more than moderate restrictions with respect to activities of daily living and social functioning. [Tr. 39-40.] Accordingly, he found that she could perform light, unskilled work consisting of simple and repetitive tasks, limited such that she would have no consistent contact with the public (among other limitations not relevant here). [Tr. 35.] Because such work existed in the national economy, the ALJ deemed Ms. Moles not disabled. [Tr. 46.]

## IV.
### DISCUSSION

Ms. Moles argues that at Step Three of his analysis, the ALJ erred by incorrectly defining the mental health listing requirements and by not giving controlling weight to the opinion of Ms. Moles' treating physician, Dr. Luo. Ms. Moles further argues that insofar as the ALJ disregarded Dr. Luo's opinion, his RFC assessment is not supported by substantial evidence. Finally, she claims that the question the ALJ posed to the vocational expert was flawed insofar as it did not account for her limitations in concentration, persistence, or pace.

**A) The ALJ's Definition of Decompensation**

Ms. Moles first argues that the ALJ erred by failing to consider the equivalency requirements contemplated by the mental health listings.

To meet the requirements under paragraph C of the mental health listings, a plaintiff must show a medically documented history of a chronic applicable disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities,

9

with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt.404, Subpt. P, App. 1, §§ 12.03, 12.04, 12.06, 12.08.

"Episodes of decompensation" are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00; *see also Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010); Stedman's Medical Dictionary, 497 (28th ed. 2006). The regulations define "each of extended duration" as three episodes within one year, or an average of once every four months, each lasting at least two weeks. 20 C.F.R., Pt. 404, Subpt. P, Appendix 1, Section 12.00C. But the regulations further provide that if a claimant has less frequent episodes of longer duration or more frequent episodes of shorter duration, the ALJ must use his judgment to determine if the effects of the episodes are of equal severity and may be the equivalent of the durational and frequency requirements noted above. *Id*.

Here, the ALJ concluded that Ms. Moles had not met the requirements of Paragraph C. Specifically, the ALJ found that Ms. Moles had not experienced any periods of decompensation of extended duration. [Tr. 34 ("As for episodes of decompensation, each of extended duration, the claimant experienced no such episodes . . . . [T]here is no evidence that even a minimal increase in mental demands or change in the environment would have been predicted to cause

10

the claimant to decompensate. Further, there is no history of an inability to function outside a highly supportive living environment."] In so concluding, the ALJ defined "episodes of decompensation, of extended duration," as "three episodes within one year, or an average of one every four months, each lasting for at least two weeks"—without considering that more frequent shorter episodes may be equivalent to the durational and frequency requirements. [Tr. 33.]

Ms. Moles argues that she in fact had periods of decompensation, during and before the prescribed period, which were frequent enough to meet the equivalency requirements of the mental health listings, and that the ALJ erred by failing to consider them. She points to Dr. Luo's opinion that Ms. Moles had experienced repeated "episodes of decompensation, resulting in job loss, inability to keep a job, medication non-compliance resulting in increased symptoms, poor decision making, medication changes, increased need for therapy and/or case management services. She has also been hospitalized at Anderson Center and resided in a group home." [Tr. 881.]

In response to Ms. Moles argument that the ALJ erred by failing to consider the issue of equivalency, [*see* dkt. 35 at 22], the Commissioner simply maintains that any of Ms. Moles' alleged periods of decompensation lasting more than two weeks (namely, her hospitalizations) occurred before the prescribed period.[8] [Dkt. 35 at 19 (citing 33-35).] As to episodes within the prescribed period, Defendant argues, the ALJ "considered Dr. Luo's . . . opinion that Plaintiff had several episodes of decompensation, but found that the record evidence showed that none of them were of extended duration."). [*Id.* (citing tr. 34-35).]

---

[8] Although Defendant admits that Ms. Moles' stay at a group home overlaps with the prescribed period, he emphasizes that the stay does not meet the requirement of being two weeks in duration. [Tr. 882.]

11

Both the Commissioner and the ALJ miss the point. Both rely on the lack of extended duration as basis for denial. And both wholly fail to address whether the "numerous" episodes of decompensation to which Dr. Luo referred, taken along with other episodes in the extensive record, [see dkt. 30-4], met the listing's equivalency requirements.

The ALJ also chooses to disregard any episodes outside the prescribed period. Dr. Luo references many such episodes within and without the prescribed period to support his opinions. But contrary to the ALJ's self-created exclusionary rule, there is no explicit requirement within Paragraph C that the "episodes of decompensation, of extended duration" must actually occur within the prescribed period.[9]

Although the ALJ has discretion to decide what episodes in the record actually constitute decompensation, and whether shorter, more frequent episodes of decompensation actually meet the requirements of the listing, *Bullard v Astrue*, 2010 WL 779454, \*9 (S.D. Ind. 2010), he must nevertheless build an accurate and logical bridge from the evidence to his conclusion. *Scott v. Barnard*, 297 F.3d 589, 595 (7th Cir. 2002). In so doing, the ALJ has an obligation to consider all relevant evidence and cannot cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability. *Myles v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Likewise, the ALJ has an obligation to discuss the medical records referencing episodes of decompensation. *Bullard*, 2010 WL 779454 at \*9.

Given that Ms. Moles' record reflects a long history of mental illness, punctuated by periods of what her treating physician deemed "decompensation," [*see* dkt. 30-4 at 4-9],[10] the

---

[9] Ms. Moles is correct to concede, however, that the more remote the episodes of decompensation were, the less probative they are of mental illness within the prescribed period.

[10] Defendant argues that the Court should disregard the "Appendix of record excerpts showing what she believes were episodes of decompensation and 'fluctuations' in mental health that were the equivalents of repeated episodes of decompensation, each of extended duration" because

12

ALJ's disregard for any referenced episodes undermines his obligation to examine all the evidence and to explain his findings accordingly—regardless of whether he ultimately determined these episodes to be frequent or severe enough meet the requirements of the mental health listings. There is simply no indication this type of analysis was undertaken here.[11]

The Commissioner also attempts to distinguish this case from *Larson,* where the court found that events such as hospital stays or stays in a halfway house qualify as episodes of decompensation, and that the ALJ erred by failing to give the treating physician controlling weight when he noted such episodes. 615 F.3d 744, 750-51. Whether or not the facts in this case are analogous to those in *Larson*, however, is immaterial to the underlying problem: The ALJ defined "of extended duration" without regard to possible equivalency and did not explain his reason for doing so.

The Court therefore remands this case to the Agency for examination of the record in light of each of Paragraph C's provisions, and with specific instruction for the ALJ to make the requisite determination as to whether the episodes of decompensation experienced by Ms. Moles can be found equivalent to the duration and frequency requirements.

---

"she provides no analysis of this evidence." [Dkt. 35 at 21 ("Plaintiff has [] waived her argument by failing to set forth how this evidence was relevant to the ALJ's Step Three finding as to paragraph C." (citation omitted).] But little explanation is required beyond what the medical evidence itself shows, and in a record this extensive, a summary of the evidence Ms. Moles believes constitutes periods of decompensation is welcome—perhaps necessary. Defendant's waiver argument is thus unavailing.

[11] The ALJ, without citing to a single medical source, attributes the changes in Ms. Moles' diagnoses not to episodes of decompensation but to Ms. Moles' "long history of significant alcohol abuse. While there is no evidence of any alcohol use after June of 2001, through the end of her prescribed period on June 30, 2005, it took some time for the effects of the claimant's long-term alcohol use to wear off and her true diagnoses to become apparent." [Tr. 39.] It is well-settled that the ALJ may not "play doctor." *Blakes ex. rel. Wolfe v. Barnhart,* 331 F.3d 565, 570 (7th Cir. 2003). Because the ALJ does not base that conclusion on medical evidence in the record, the Court concludes that the ALJ's commentary on Ms. Moles' changing diagnoses is without evidentiary support.

### B) The ALJ's Treatment of Dr. Luo's Opinion

Ms. Moles also argues that the ALJ erred at Step Three by failing to give the opinion of her treating physician, Dr. Luo, controlling weight or, alternatively, by failing to articulate the extent to which he considered this opinion in his Step Three ruling.

To meet the requirements for Paragraph B at Step Three, a plaintiff must show that her mental impairments caused at least two "marked" limitations or one "marked" limitation and repeated episodes of decompensation—"marked" is described as more than moderate, but less than extreme. 20 C.F.R, Pt. 404, Subpt. P, App.1, §§ 12.03, 12.04, 12.06, 12.08, [tr. 33]. Again, among the ways a plaintiff can meet the requirements of Paragraph C is by showing a medically documented history of a chronic applicable disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms currently attenuated by medication or psychological support, and repeated episodes of decompensation, each of extended duration. 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.00C.

In determining whether a claimant meets the requirements at Step Three, the ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic testing and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2), § 416.927(d)(2); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). If the ALJ concludes that the treating physician's opinion is inconsistent with other evidence, he must articulate and explain the inconsistency. *Giles v. Astrue,* 483 F.3d 483, 488 (7th Cir. 2007).

Here, Ms. Moles' treating physician, Dr. Luo, found that Ms. Moles the requirements of Paragraphs B and C of the mental health listings. But the ALJ did not give Dr. Luo's opinion

controlling weight with respect to either paragraph, nor did he explain what weight, if any, he gave the opinion.

### 1. Paragraph B.

With respect to Paragraph B, Dr. Luo found that Ms. Moles had marked limitations in social functioning, concentration, persistence and pace. [Tr. 881; 878-879.] But the ALJ concluded that Dr. Luo's opinion was not supported by record evidence. [Tr. 34.]

Social functioning refers to a plaintiff's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App 1 § 12.00 C2. This includes the ability to "get along with family members, friends, neighbors, grocery clerks, landlords and bus drivers." *Id.* A plaintiff may demonstrate impaired social functioning by, for example, a history of altercations, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. *Id.* Social functioning in work situations specifically may involve interactions with the public, responding appropriately to supervisors, or cooperative behaviors involving coworkers. *Id.* Concentration, persistence or pace, on the other hand, refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work setting. 20 C.F.R. Pt. 404, Subpt. P, App 1 § 12.00 C 3.

Dr. Luo noted several social limitations—including communicating clearly and effectively, getting along with family and friends, getting along with strangers such as grocery clerks or bus drivers, showing consideration for others, displaying awareness of others' feelings, cooperating with co-workers, responding to supervision, responding to those in authority, responding without fear to strangers, establishing any inter-personal relationships, and holding a job. [Tr. 879.] He further indicated that, with respect to concentration, persistence, and pace,

15

Ms. Moles had trouble sustaining tasks without undue interruptions or distractions and without breaks or rest periods.

The ALJ neglected to mention the limitations Dr. Luo found. Rather, he pointed principally to Ms. Moles' activities of daily living, including her ability "to shop, go to the library, drive, get rides, go to concerts, walk for transportation and exercise, visit with friends and relatives, and baby-sit for her grandchildren . . . . With regard to concentration, persistence or pace, the claimant . . . spent a lot of time baby-sitting for her grandchildren . . . [and] was able to maintain personal hygiene [and] live alone at times." [Tr. 34, 40.] Although the ALJ characterizes these activities as indicators of social functioning and ability to maintain concentration, persistence, or pace, respectively, they do not tell the whole story.

The ALJ must address difficulties in performing activities of daily living, maintaining social relationships, and maintaining concentration, persistence or pace. 20 C.F.R. Pt. 404, Subpart P, Appx. 1§ 12.00. He did not do so here and paid little attention to Ms. Moles' documented difficulties. [Tr. 40 ("[W]hile there are several GAF ratings at 31-40 (internal citations omitted), the claimant's demonstrated level of functioning was higher.").]

Having reviewed the record, the Court is unconvinced that Dr. Luo's opinion would have contradicted other record evidence relevant to Ms. Moles social functioning and concentration, persistence, or pace, had it been considered by the ALJ.[12] In any event, the ALJ had an obligation to acknowledge evidence regarding all three functional categories in his assessment of

---

[12] Dr. Luo's opinion is actually consistent with the ALJ's finding that Ms. Moles can perform activities of daily living without significant limitation. Dr. Luo found that she was not impaired in areas relevant to this category of activity. [Tr. 878.] Given the ALJ's near-myopic focus on activities of daily living, he could not logically conclude that Dr. Luo's opinion was inconsistent with the record.

16

the propriety of Dr. Luo's opinion and of whether Ms. Moles met the Paragraph B requirements. He failed to do so.

### 2. Paragraph C

With respect to Paragraph C, Dr. Luo noted that Ms. Moles had repeated episodes of "decompensation, resulting in job loss, inability to keep a job, medication non-compliance resulting in increased symptoms, poor decision making, medication changes, increased need for therapy and/or case management services." [Tr. 881.] The ALJ held, however, that "while Dr. Luo notes numerous episodes of decomposition (internal citation omitted), the evidence of record fails to show any of these w[as] of extended duration." [Tr. 35.]

The ALJ's assertion that Dr. Luo's report is inconsistent with the record insofar as Ms. Moles did not have "three episodes [of decompensation] within one year, or an average of one every four months, each lasting for at least two weeks," belies the ALJ's more fundamental mischaracterization of the 12.03 criteria, discussed above. Taking the broader approach to decompensation called for by the regulations might well lead the ALJ to reevaluate the weight appropriately afforded to Dr. Luo's opinion.

### 3. Determining the Proper Weight to Afford Dr. Luo's Opinion

Even if the ALJ does not accept the treating physician's opinion with respect to either of these two Paragraphs—and he need not, if the evidence does not support it—the ALJ must evaluate the treating physician's opinion based on the length, nature and extent of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the consistency and support of the physician's opinion. 24 C.F.R.§ 404.1527(d)(2). He must then decide what weight to give to that opinion and explain the reasons for his decision. *Larson*, 615 F. 3d at 749.

17

There is no indication here that the ALJ undertook such analysis with respect to Dr. Luo's opinions of either Paragraph B or C. Because the ALJ did not evaluate or explain the weight he gave Dr. Luo's medical opinion, the Court finds that remand is warranted.

**C) RFC Determination**

Additionally, Ms. Moles argues that the RFC determination is flawed because the ALJ did not properly consider the treating physician's opinion and because he put too much stock in Ms. Moles' activities of daily living, rather than considering her capacity for social functioning.

In his RFC determination, the ALJ adopted the medical opinion of consultative psychologist Dr. Pitcher, [tr. 1555-64], and concluded that Ms. Moles experienced only moderate restrictions of daily activities and no more than moderate limitations of social functioning due to her mental health disorders. As such, the ALJ found that she could perform simple, repetitive tasks in socially isolated situations.

Ms. Moles wages a host of arguments against the ALJ's RFC determination, but they are centered principally around the fact that the ALJ ignored the opinion of Dr. Luo, who performed Mental Residual Functional Capacity Assessment in 2004. [Tr. 43 ("The assessments completed by Dr. Luo . . . indicate that the claimant had marked limitations in many work-related abilities. However . . . the level of impairment []he notes is not documented in the evidence of record."); tr. 883-886; tr. 1095.] In his assessment, Dr. Luo found that Ms. Moles was markedly limited in areas related to sustaining concentration and persistence, as well as social interaction and adaptation—he therefore limited Ms. Moles to simple, repetitive tasks performed for a two-hour duration. The two-hour durational restriction, Ms. Moles argues, is vital to accommodate the limitations Dr. Luo noted in concentration and persistence.

Because the weight afforded to Dr. Luo's opinion must be re-evaluated on remand, it may well bear on the ALJ's RFC assessment. Consequently, it would be premature for the Court to pass on the propriety of the ALJ's RFC determination at this juncture. On remand, however, the Commissioner should be mindful that the Seventh Circuit has cautioned against putting undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home. *Craft v. Astrue*, 539F.3d 668, 680 (7th Cir. 2008).[13]

**D) Hypothetical Question to Vocational Expert**

Ms. Moles also challenges the hypothetical question posed to the vocational expert because it does not account for her limitations in concentration, persistence, and pace.

Again, because the ALJ's consideration of the treating physician's opinion may well change, so too will the question posed to the vocational expert. Thus, the Court declines to rule on this issue at this juncture.

The ALJ should be mindful on remand, however, that limiting a claimant to simple, repetitive tasks does not always account for limitations in concentration, persistence, and pace. *See, e.g., Steward v. Astrue,* 561 F.3d 679, 684-85 (7th Cir. 2009). Additionally, the ALJ should be mindful that the existing hypothetical may also be deficient insofar as it only accounts for interaction with the public and does not account for the fact that Ms. Moles may be limited with respect to social interaction involved with co-workers and supervisors as well. [*See* tr. 1755-58.]

**E) Past Benefit Applications**

In addition to her DWB application, Ms. Moles argues that if this case is remanded, the ALJ should re-open her previously denied SSI claim, filed August 29, 2001. [Dkt. 30-1 at 34.] In the previously remanded decision, however, the ALJ declined to reopen the prior SSI

---

[13] The ALJ should also be mindful on remand that this case warns against making the kind of boilerplate credibility determination that the ALJ made here. [Tr. 36.]

adjudication. The ALJ's refusal to reopen is within the purview of Agency discretion and is not reviewable by this Court, *see, e.g., Johnson v. Sullivan*, 936 F.2d974, 976 (7th Cir. 1991), so the Court can find no error with respect to this argument.

## IV.
### CONCLUSION

For the reasons detailed in this Order, the Court **VACATES** the ALJ's decision denying Ms. Moles benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g). The Court will enter **FINAL JUDGMENT** accordingly.

06/29/2011

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

D. Eric Hall
ATTORNEY AT LAW
hall@dehattorney.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov